## F. W. WOOLWORTH CO. v. UNITED STATES.
### No. 455.

Circuit Court of Appeals, Second Circuit.
July 19, 1937.

974

Tolbert, Ewen & Patterson, of New York City (Ward V. Tolbert and Bertram F. Bongard, both of New York City, Douglas H. Thayer, of Yonkers, N. Y., and John L. McMaster, of New York City, of counsel), for plaintiff.

Lamar Hardy, U. S. Atty., of New York City (David McKibbin, 3d, Sp. Asst. U. S. Atty., and Leon E. Spencer, Asst. U. S. Atty., both of New York City, of counsel), for defendant.

Claude R. Branch, of Providence, R. I., and Edward H. Green, of New York City (Choate, Hall & Stewart, of Boston, Mass., and Sullivan & Cromwell, of New York City, of counsel), amici curiæ.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Both sides appeal from a judgment in an action under the Tucker Act (28 U.S.C. A. § 41(20) to recover income taxes alleged to have been unlawfully collected from the plaintiff for the years 1922, 1923, 1924, and 1925. With one exception the issues raised concern taxes paid by foreign corporations of whose shares the plaintiff owned more than a majority. The first question is whether the plaintiff should have been credited with payments alleged to have been withheld as taxes from dividends declared by a British subsidiary, of whose shares it held sixty-two per cent. It depends upon the construction of section 238 (a) of the Revenue Acts of 1921 and 1924 (42 Stat. 258, 43 Stat. 286), and is the same question which we decided this term in Biddle v. Commissioner, 86 F.(2d) 718, under section 131 (a) (1) of the Revenue Act of 1928 (26 U.S.C.A. § 131 (a) (1) and note). The plaintiff reargues the point and asks us to reconsider our decision. In the earlier case we accepted the testimony of an expert in English law that the shareholder was regarded in that country as the taxpayer, but we thought it irrelevant because the question was of the meaning of the word, "paid," in section 131 (a) (1). We have no doubt that, so far at least, our earlier decision is unassailable; we are dealing with our own statute, and until the contrary appears, we should not assume that Congress adopted a shifting standard, or meant to incorporate other definitions by reference. What then is that meaning? It is first necessary to see what are the facts in which the word is to be applied. The primary duty or liability under the British law, as with us, is laid upon the corporation as a juristic person; the tax is "charged on" and must be "paid by" it. (Miscellaneous Rules Applicable to Schedule D § 1.) The only money received by the Crown is what comes from the corporate treasury; at least unless the corporation fails to declare dividends in the form hereinafter stated, in which event it has been intimated that the shareholder is liable. Hamilton v. Commissioners Inland Revenue, (1931) 2 K.B. 495, 521. The British law might have so far treated the corporation as separate from the shareholders that it also taxed them on their dividends. That it did not do, deeming that that would be double taxation, for beneficially the corporation is merely the aggregate of its shareholders.

The implications of that concept it worked out scrupulously in other problems which arose: as to exemption, as to minimum income, and later as to surtax, "supertax." If a shareholder is exempt, the tax paid by the corporation becomes in part his tax and he is entitled to a refund; so too when his total income including the dividend is below the minimum. Again in estimating his surtax his dividend is not its strict measure if the corporation is a mere aggregate; his income includes his aliquot part of the corporate income and the corporate tax may not be deducted from it any more than the "normal tax," as we call it, should be deducted from any other part of it. All this the British law affects to do; the result being that the corporate tax is for these purposes treated as though it were distributed ratably among the shareholders. The law does not, it is true, try to do this to the penny; instead, it substitutes a method which in the long run is an equivalent. When the corporation declares a dividend it is "less income tax" or "free of income tax," which means that a nominal dividend is declared upon which a nominal tax is levied at the rate current in that year, regardless of the rate in force when the corporation paid the tax on the earnings declared. The shareholder must compute his "supertax" upon that nominal dividend, though he never gets it and never pays the nominal tax which is considered as withheld from it. The scheme in this aspect is designed as if the shareholders were the taxpayers; though the only legal duty is imposed upon the corporation and the remedies run against it; and although the English courts have, to put it moderately, never committed themselves to the doctrine that the corporation merely acts as paying agent for the shareholders.

Our own law does not proceed on that theory. It is true that it does not tax both corporate income and dividends; so far it recognizes that beneficially the corporation is an aggregate of the shareholders. But there it stops; it does not attempt to go back into the corporate finances to accommodate practice to principle as to minimum incomes or surtaxes; the shareholder's income is his dividend. It seems to us therefore that when Congress used the word, "paid," we should read it upon the background of our own fiscal system, and treat the shareholder as paying no part of the tax levied upon and paid by the corporation. Welch v. St. Helens Petroleum Co., 78 F. (2d) 631 (C.C.A. 9). Perhaps it is better to conceive of the corporation as merely a paying agent for the group, but it is not our way. We might agree that if the plaintiff could point to a legal duty laid upon shareholders which was discharged, section 238 (a) would protect it, but it cannot do so. At most it can say that the shareholders may in some circumstances be sureties for a tax primarily imposed upon the corporate personality, but that would not make them "pay" the tax any more than any other surety pays when the principal pays. It does not advance the solution to say, as in United Shoe Machinery Co. v. White, 89 F.(2d) 363 (C.C.A. 1), that it makes no difference to the shareholder whether he pays the tax, or whether the corporation pays it and takes it out of his dividend. That is true, but the final incidence of the tax does not determine its legal nature; else the shareholders would pay the normal corporate tax under our own system. We adhere to our decision in Biddle v. Commissioner, supra, 86 F.(2d) 718.

The plaintiff insists that in any event the Commissioner concluded himself by a "closing agreement" executed by him on January 22, 1932. This first recited the plaintiff's "gross income," its "allowable deductions from gross income" and the "allowable credits for taxes paid or accrued to foreign Governments," as the Commissioner had determined them for five years, including the four here in question, and then stipulated that the gross income and allowable deductions "other than deductions for foreign taxes" should be final, except that the taxpayers might reopen "allowable deductions * * * claimed by them for foreign taxes paid or accrued * * * to the extent that the same may be disallowed as credits." The agreement concluded by expressly leaving open for adjustment "credits allowable under, and the proper interpretation of Section 238 * * * for taxes paid or accrued to foreign countries." The Commissioner had disallowed these credits on December 6, 1930, over a year before, so that the issue had been already raised. (We attach no significance to the wording of an earlier proposed closing agreement.) Naturally the plaintiff had to include the nominal dividends in its gross income, since the equally nominal "payments" could not at once be credits upon its tax and no part of its income. Therefore, the argument runs, the Commissioner agreed that the sums deducted from the nominal dividends should be treated as

credits, because the dividends were otherwise confessedly too large, and because they could not be "deductions" from gross income as that word is used in our statutes. Thus in spite of the express reservation as to credits, the plaintiff asks us to suppose that the Commissioner unintentionally gave away his case. It may be that the plaintiff's stipulation works unjustly against it; certainly it does, if, as it concedes, the amounts which we are refusing to treat as credits under section 238 (a) cannot be "deductions" from its gross income. The reservation as to deductions should doubtless have been made more comprehensive, so as to include as such all sums which were not allowed as credits to the plaintiff under section 238 (a). If it were possible we should make that adjustment now, but, we cannot take the heart out of the stipulation because it works harshly.

The judge agreed with what we have said so far, but felt bound to yield to contrary rulings of the Treasury, both before and after the Acts of 1921 and 1924. For a number of years this very plaintiff had been allowed as taxes paid under section 238 (a) the deductions of its subsidiary from the supposititious dividends declared. The reasoning by which such rulings are deemed to be incorporated into the law upon its reënactment are familiar, and we should have no right to disregard it, whether or not in a given instance it represents a real assent by Congress. But not every ruling is incorporated in the text because it is not repudiated; no one has ever suggested anything of the sort. At most, administrative practice is a weight in the scale, to be considered, but not to be inevitably followed. Here the inference is a good deal weaker than usual because it rests upon an interpretation applicable to the British act which is but a part of all the section covers. To suppose that Congress must particularly correct each mistaken construction under penalty of incorporating it into the fabric of the statute appears to us unwarranted; our fiscal legislation is detailed and specific enough already. While we are of course bound to weigh seriously such rulings, they are never conclusive; here, it seems to us that they are not enough to turn the scale.

The next question concerns section 238 (a). Section 238 (a) allows a credit to any taxpayer who has paid foreign income taxes, but with a limit; section 238 (e) allows a credit to a parent corporation whose subsidiary has paid foreign income taxes, but with another limit. It is the position of the defendant that the limit of subdivision (a) should be applied to the sum of the credits allowable under both itself and subdivision (e). This issue is moot, in view of our decision just made. It does not arise in 1922 and 1923, because the plaintiff paid no direct foreign taxes in those years, and it is only when there is a sum of direct taxes and of taxes paid by a subsidiary that it can arise; for the fraction to be used under (e) upon the total of taxes against which the credit is sought can never be greater than that used under (a). In 1924 the direct foreign taxes were only $150.55—paid to Cuba—and may be disregarded; in 1925 they were $10,709.81 —also paid to Cuba—and the total of all income taxes due the United States was $3,593,356.20. The court has found that the proportion of foreign to total income was .12; but strictly the fraction was more than .126, and the limit under (a) was over $450,000. That is more than the sum of all the foreign taxes, both direct and subsidiary, even if we do not apply to the subsidiary taxes their proper limit as defined by subdivision (e). We are not clear that the plaintiff means to press this point anyway, if the first goes against it; but if it does, this is the answer.

The next question arises from the refusal of the Commissioner to include among the taxes paid by the British subsidiary certain payments made by it under "Schedule A" of the British Income Tax Law. It was the owner of certain parcels of realty which it let, and it occupied other parcels which it had leased from others. The British act (Schedule A), levies an income tax upon the "annual value" of real property which is estimated by the sum for which it has been rack-rented within seven years, when it has been so rented, and by the rack-rents it is "worth to be let," when it has not (Rule I, Schedule A). The tenant, "occupier," is liable (Rule No. VII, § 1), but he may recoup out of the rents for so much of the tax as is properly apportionable against them (Rule No. VIII, § 1). Apparently if the value of the land, as estimated in accordance with Rule No. I, is greater than the rents—that is, if the rents are not rack-rents fixed within seven years—the tenant, as "occupier," bears the tax upon any surplus value. The stipulation on which this case was tried was apparently drawn with this in mind; we may assume arguendo that the subsidiary paid in-

---

come taxes when the tenants withheld them out of its rents; it certainly paid taxes upon any surplus value of the leased land which it occupied. But the second kind of payment was not "income taxes" within section 238 (e) or a proper credit to the plaintiff. The fact that it was included in a statute purporting to levy an income tax is immaterial. Our statute allows a credit for "the same proportion of any income * * * taxes paid * * * upon * * * the accumulated profits * * * from which * * * dividends were paid, which the amount of such dividends bears to * * * such accumulated profits." A tax levied upon the use of land—however described—is not an "income tax" of the kind here intended; it is not paid upon accumulated profits except by the fiction of treating the value of the land when occupied as a profit. It is not necessary here to say whether "income tax" in section 238 (e) always means what we call income tax; at least it cannot mean this part of the British tax. The stipulation does not separate that part of the tax which was paid upon rents received by the subsidiary from that part paid for occupation; as the second is certainly not allowable, we can allow no part.

The next question involves the computation of the credit allowable under section 238 (e). As has already appeared the plaintiff is entitled to a credit under that section; all taxes paid by the British subsidiary under Schedule D of the British Act properly enter into the base on which this is to be computed; but no part of those paid under Schedule A, for the reasons just given. This base is multiplied by a fraction in which the dividends declared and paid to the plaintiff are the numerator, and the "accumulated profits" of the subsidiary are the denominator. The dispute arises over the phrase, "accumulated profits," which is defined later in section 238 (e) as "gains, profits, or income in excess of the income, war-profits, and excess-profits taxes." The statute does not therefore allow the denominator to be reduced by subtracting any taxes except income taxes; and it follows that the taxes under Schedule A cannot be subtracted.

Until November 6, 1923, the Irish business of the plaintiff was conducted by the British subsidiary; thereafter an Irish corporation was formed in whose name it was carried on. The British subsidiary owned all its shares and completely dominated it,

for formally at least it was a separate corporation. The question arises as to taxes paid by this sub-subsidiary, so to speak; whether they enter into the credits allowable under section 238 (e), and whether they should be deducted from its earnings to reach "accumulated profits." Section 238 as a whole is drawn upon the assumption that the corporate form is critical; this follows from the very distinction between subdivision (a) and subdivision (e). If the domestic corporation pays a foreign tax the credit is measured in one way; if its subsidiary does, in another, though the domestic corporation may hold every share of it, and completely dominate it. It is the double incorporation which counts. Congress might indeed have extended the difference to sub-infeudations, but it has not, and there is not the least reason to suppose that it meant to. F. H. Peavey & Co. v. United States, 55 F.(2d) 516 (Ct.Cl.). The taxes of the Irish corporation are therefore not to be included in the credit, nor are they to be deducted to find the "accumulated profits"; but of course taxes paid to the Irish Free State before November 6, 1923, will be included in both.

We cannot understand the defendant's argument as to the credit for the Canadian subsidiary's payments. All the taxes paid by it were income taxes; they were credits under section 238 (e) and should have been deducted to reach the "accumulated profits" of that company. As all the earnings of that company were declared as dividends, and as it does not appear that the subsidiary paid any taxes that were not income taxes, it must follow that the proportion of dividends to "accumulated profits" was one to one.

The final question is quite different from any hitherto discussed; it concerns the sufficiency of two claims for refund which the Commissioner rejected, though they were concededly good in substance. A revenue agent after going over the plaintiff's returns, reported to the Commissioner in favor of an allowance for obsolescence of certain leases for the year 1922 and 1923, though the plaintiff had not claimed it; on July 31, 1925, he forwarded to it a copy of this report, containing two deductions for "amortization of leaseholds." On April 27, 1927, the Commissioner confirmed this allowance for 1922 by a letter to the plaintiff; we can find no confirmation for 1923. In compliance with the Commission-

er's suggestion the plaintiff then filed a claim for refund for 1922 on September 13, 1927, and for 1923 on October 20, 1927. The first gives as a reason for the refund the letter of April 27, 1927, showing the over-assessment, made up in part of the failure to allow the deduction; a copy of that letter was also annexed to the return. The second return attached a copy of the agent's report, and incorporated generally all annexed documents. The Commissioner considered these claims, and allowed as deduction the amounts found by the agent; he also found that the allowances should have been greater, but refused to allow the excess because it had not been claimed. The question is whether this ruling was right. The bulk of the claims was for the foreign taxes; they were intricate and complicated; nevertheless, the first at any rate included a claim for deduction for amortization; indeed it is hard to see how the Commissioner could have made any allowance whatever, unless the claim had included it. The second meant to ask for at least what the agent had allowed; that too the Commissioner granted. The fact that the plaintiff had not demanded more than these deductions is not controlling; the ad damnum could have been increased; not even that much was necessary, for the official form itself after the statement of the amount of the refund claimed, added in parenthesis the words, "or such greater amount as is legally refundable." The defendant does not dispute that the claim was good for any amount which might be found due upon the facts stated in the claims, but says that the facts were not sufficiently alleged. That depends upon whether the attached documents are to be included; they must be, and among them was the agent's finding that the leases were a wasting asset for the obsolescence of which some allowance was deductible. The particulars of this might indeed be demanded, but as a pleading it was enough. United States v. Memphis Cotton Oil Co., 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619.

The judgment is modified so as to provide as follows:

(1) No credit will be allowed under section 238 (a) for nominal taxes withheld from the dividends declared by the British subsidiary.

(2) Taxes levied under Schedule A of the British Income Tax Law will not be allowed as credits under section 238 (e).

(3) No part of the taxes paid by the Irish subsidiary will be allowed as credits under section 238 (e).

(4) All taxes paid by the British subsidiary under Schedule D, and all taxes paid by the Canadian subsidiary will be allowed as credits under section 238 (e).

(5) The "accumulated profits" used in determining credits under section 238 (e) will be reckoned by deducting all taxes paid under Schedule D in the case of the British subsidiary, but not those paid under Schedule A, or the Irish taxes; in the case of the Canadian subsidiary, by deducting all the taxes at issue.

(6) An allowance of $4,000 for obsolescence of leaseholds will be granted.

Judgment reversed and cause remanded for further proceedings not inconsistent with the foregoing.